

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 5, 2026

**BY ECF**

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

    Re: ***United States v. Juan Pablo Lozano*, 23 Cr. 180 (KPF)**

Dear Judge Failla:

    The Government respectfully submits this letter in advance of the June 12, 2026 sentencing of defendant Juan Pablo Lozano ("Lozano" or "the defendant"), following his guilty plea for conspiring to import fentanyl into the United States, in violation of Title 21, United States Code, Sections 960(b)(1)(F) and 963. As set forth below, the defendant trafficked in two deadly products: fentanyl and firearms. He did so repeatedly and without regard to the harm he was causing in both the United States and Mexico. To make matters worse, the defendant placed the lives of young women in grave danger, recruiting them to serve as "mules" to ingest thousands of deadly fentanyl pills so that they could smuggle those pills across the border on his behalf. The defendant's conduct was horrific, and it was not an aberration—he has spent his adult life committing serious crimes, including assaults and robberies, and his conduct has only escalated with time. A significant sentence is necessary to incapacitate and deter the defendant, who has demonstrated, time and again, that he poses a significant danger to the community.

    Accordingly, and for the reasons set forth below, the Government respectfully submits that a sentence of 240 months' imprisonment is warranted and would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## I. Offense Conduct

    The Sinaloa Cartel is a primary distributor of fentanyl to the United States and relies upon, among others, weapons suppliers and traffickers who, among other things, direct, supervise, and personally engage in the smuggling of firearms and fentanyl cross the U.S.-Mexico border.[1] A

---

[1] *See* U.S. Drug Enforcement Administration, National Drug Threat Assessment 2024 at 6, https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf ("The Sinaloa Cartel dominates the fentanyl market through its manipulation of the global supply chain and the

faction of the Cartel is led by the Chapitos, the sons of the Cartel's notorious former leader, "El Chapo." The defendant was a weapons supplier and fentanyl trafficker who worked with members of the Cartel, including Chapitos associates and sicarios, and with Cartel-aligned groups. (*See* May 7, 2026 Final Presentence Investigation Report ("PSR") ¶ 26). In that capacity, the defendant regularly crossed from the United States to Mexico with a range of dangerous firearms that he knew would be used to support and promote the Cartel's violent drug trade, including machineguns, pistols, automatic rifles, and grenades. (PSR ¶ 33). Some of the smaller-caliber pistols smuggled by the defendant were routed into the Ciudad Juarez jails for use by imprisoned Cartel sicarios. (PSR ¶ 33).

In August 2021, and in furtherance of his drug and gun trafficking activity with the Cartel, the defendant attended a meeting with a U.S. border official ("CC-1"). (PSR ¶ 34). Over the ensuing approximately 12 months, CC-1, in exchange for payment from the Sinaloa Cartel, facilitated the defendant's trafficking by permitting the defendant to cross into and out of the United States as he desired during CC-1's shift, which began each night at approximately 10:00 p.m. (PSR ¶ 34). During CC-1's shift, the defendant supervised a smuggling operation, for which he recruited financially desperate American women and directed them to repeatedly ingest fentanyl pills or insert fentanyl pills into their bodies in order to smuggle the drugs through the port of entry. (PSR ¶ 34). The mules ingested or inserted into their bodies up to approximately 2,000 fentanyl pills on each of three trips across the border each night. (PSR ¶ 34).

On September 19, 2022, the defendant was arrested after he was caught personally smuggling fentanyl into the United States through El Paso, Texas, in the Western District of Texas. (PSR ¶ 35). The processing Customs and Border Patrol officer noticed an abnormal bulge in the defendant's groin area and referred him to secondary inspection. (PSR ¶ 35). The secondary inspection uncovered a small plastic bag containing blue pills that tested positive for fentanyl and weighed approximately 56.2 grams. (PSR ¶ 35).

The defendant claimed, falsely, that he did not know what type of pills were in his possession and that he had a prescription he had left in Mexico. (PSR ¶ 37). The defendant then stated that he believed the pills were fentanyl pills and knew they were illegal, and that an unknown male in Juarez had instructed him to smuggle the pills into the United States. (PSR ¶ 37). The defendant claimed, again falsely, that he was not paid to smuggle the pills and had been threatened by an individual, and that he had previously smuggled pills (100 at a time) approximately six times. (PSR ¶ 37). The defendant was subsequently charged with fentanyl importation and possession of fentanyl with intent to distribute in the Western District of Texas, pled guilty, and on March 15, 2023, was sentenced to 60 months' imprisonment. (PSR ¶ 37).

---

proliferation of clandestine fentanyl labs in Mexico. . . . Los Chapitos initially established a base of operations for manufacturing illicit fentanyl in the mountains near Culiacan. Now, they control the procurement of precursor chemicals, largely from China, and direct the production of illicit fentanyl from labs hidden in the mountains of Sinaloa and in other Sinaloa Cartel strongholds throughout Mexico.").

## II.  Procedural History and Guidelines Calculations

On April 4, 2023, Lozano was charged in five counts of an eight-count indictment. Count Two charged him with participating in a conspiracy from at least in or about 2014, up to and including on or about April 4, 2023, to (i) import 400 grams and more of fentanyl into the United States, (ii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, and (iii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl on board an aircraft registered in the United States, in violation of Title 21, United States Code, Sections 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), 960(b)(1)(F), and 963. Count Three charged him with participating in a conspiracy to distribute and possess with intent to distribute 400 grams and more of fentanyl, in violation of Title 21, United States Code, Section 846. Count Four charged him with possession of machineguns and destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii). Count Five charged him with conspiracy to possess machineguns and destructive devices, in violation of Title 18, United States Code, Section 924(o). Count Six charged him with participating in a conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

On February 4, 2026, pursuant to a plea agreement with the Government (the "Plea Agreement"), Lozano pled guilty before this Court to Count Two. (PSR ¶ 1). The Plea Agreement between the parties stipulated to a total offense level of 37, a criminal history category of VI, and a Stipulated Guidelines Range of 360 to 480 months' imprisonment. (PSR ¶¶ 63, 74, 75). The Stipulated Guidelines Range was calculated as follows:

> Pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), because the defendant is responsible for conspiring to import more than 38 kilograms of fentanyl, the base offense level is 38. PSR ¶ 59. Pursuant to U.S.S.G. § 2D1.1(b)(1), because a dangerous weapon was possessed, a two-level increase was warranted. Pursuant to U.S.S.G. § 3E1.1(a) and (b), because the defendant accepted responsibility and timely notified the Government of his intention to enter a plea of guilty, a three-level deduction was warranted.

As noted in the PSR, Probation calculated a two-level increase and a higher offense level of 39 pursuant to §2D1.1(b)(11) because the defendant and others bribed a law enforcement official, to facilitate the commission of the offense, specifically entering into an agreement with a U.S. border official who permitted Lozano to smuggle fentanyl into the U.S. in exchange for bribe payments. (PSR ¶¶ 55, 118). The higher offense level, as calculated by Probation, results in the same Guidelines range of 360 to 480 months' imprisonment.

In addition, as part of the Plea Agreement, and despite the stipulated Guidelines range of 360 to 480 months' imprisonment, the Government agreed that it would not advocate for a sentence of more than 240 months' imprisonment. (*See* Plea Agreement 4).

Probation recommends a sentence of 120 months' imprisonment. (PSR at p. 31). In support of its recommendation, Probation noted that the defendant "smuggled a substantial amount of

fentanyl into the U.S. utilizing a corrupt law enforcement officer" and "engaged in a calculated effort to procure firearms for an international drug-trafficking organization. . . . [t]hese weapons were delivered directly to the Sinaloa Cartel or were routed to the Mexican prison system, where they were provided to imprisoned Cartel sicarios." (*Id.*). As Probation aptly noted, "[t]his conduct represents a blatant disregard safety of others and presents a substantial danger to the communities in both the U.S. and Mexico." (*Id.*). In addition, Probation noted the defendant's troubling criminal history, which "dates back to 2011, and consists of convictions for robbery, burglary, and assault." (*Id.*). Despite these numerous aggravating factors, and a Guidelines range of 360 to 480 months' imprisonment, Probation found that the defendant's history of substance abuse weighed in favor of a sentence of 120 months' imprisonment. (*Id.*).

## III. Relative Culpability

The defendant is one of approximately two dozen defendants charged in this case. He did not share the high-level status of the Chapitos or their top lieutenants—notably, he was not charged in Count One of the Indictment, which charges five of the defendants with participating in a continuing criminal enterprise, from at least in or about 2014, to at least on or about April 4, 2023, in violation of Title 21, United States Code, Section 848, based on those defendants' roles as principal enablers, administrators, organizers, and leaders of the Sinaloa Cartel. However, of the remaining defendants, the defendant is culpable for a broader range of offense conduct, including exploiting vulnerable women as human mules and overseeing their ingestion of thousands of potentially lethal fentanyl pills, distributing kilogram quantities of finished fentanyl, bribing a border official, smuggling everything from grenades to machineguns across the border, and thereby directly contributing to the Cartel's reign of terror in Mexico, which continues to this day. He engaged in that conduct, all in service of his own, and the Cartel's, financial profit. Thus, aside from the defendants who were charged in Count One of the Indictment, the Government considers the defendant to be one of the more culpable currently before the Court.

## IV. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the

sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

## B.   A Sentence of 240 Months' Imprisonment Is Warranted

As set forth below, a substantial term of 240 months' imprisonment would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

### 1.   The Seriousness of the Offense Conduct

The seriousness of the defendant's conduct alone warrants a substantial term of imprisonment. Though Lozano did not enjoy the high status or power of some of his co-defendants within the pecking order of the Cartel, his culpability is significant as measured by its breadth, depth, and cruelty.

First, by serving as a weapons *and* fentanyl smuggler working with the Sinaloa Cartel, Lozano played an important role in providing the Cartel with the firearms and destructive devices it needed to enact the extreme violence that allows it to maintain power and influence within Sinaloa today, and personally served as part of the pipeline for the Cartel's massive and sophisticated international fentanyl enterprise. Because of his dual role, Lozano cannot distance himself from the abject torture, murder and threats that the Cartel used to control and subjugate an entire population; nor can he distance himself from the opioid crisis that has ravaged so much of the United States. The direct contributions of smugglers such as Lozano are foundational to the Cartel's ability to protect its enterprise, to produce and distribute fentanyl cheaply, and to conceal their procurement operations using seemingly legitimate channels within the global supply chain. Simply put, the Cartel's destructive and far-ranging drug trafficking operations could not exist without the active assistance of enablers and facilitators like Lozano, who operate with knowledge that their contributions are furthering the fentanyl trade, and that the trade is protected and promoted through extreme violence.

Second, Lozano is responsible for a bribery scheme that compromised the security of the U.S.-Mexico border. With others, Lozano paid off a U.S. border official to ensure his ability to smuggle fentanyl into the United States. This is a significant aggravating factor, as the implications extend well beyond this case, and beyond the drug trafficking realm more generally. A compromised border is dangerous to the security of both countries in innumerable respects and challenges the ability of each to maintain its laws and policies. Lozano's successful efforts to corrupt a government worker are deserving of particular consideration and should be met with substantial punishment.

Third, Lozano stands apart from many of his fellow co-defendants because of his personal role in supervising the cruel and inhumane practice of using human mules to smuggle fentanyl

across the U.S.-Mexico border. In this capacity, over the course of a year, Lozano personally recruited financially desperate women and directed them to repeatedly ingest fentanyl pills or insert fentanyl pills into their bodies to smuggle the drugs through the port of entry. (PSR ¶ 34). He oversaw this smuggling operation notwithstanding the fact that this incredibly dangerous practice, sometimes referred to as "body packing," is known to place the person at risk of acute toxicity and death, as the packages of drugs are often poorly wrapped and may rupture inside the body.[2] The details of Lozano's operation reflect the lengths to which he was willing to go, and the risks he was willing to impose on others, for his own financial gain: Lozano maximized his exploitation of these women, compelling them to swallow or insert into their bodies up to 2,000 fentanyl pills on each of three trips across the border each night. (PSR ¶ 34). That conduct was particularly dangerous because, as the Court is aware, fentanyl is a particularly dangerous substance, where even small amounts can prove to be fatal.

Lozano's significant fentanyl distribution posed serious risks not only to the women who he used as mules, but also to the end users. According to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[3] The crisis has only worsened. According to the CDC, 2023 marked the first time in U.S. history that the overdose death rate topped 112,000 in a 12 month period, with young people and people of color among the hardest hit.[4] The magnitude of this calamity now appears to have eclipsed every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[5] The cost to ordinary families destroyed by the fentanyl crisis is incalculable, and there is a real need to punish those who enable and directly contribute to the manufacture of such a deadly substance through the acquisition of precursor chemicals. Indeed, as Judge Gardephe recently stated when imposing a sentence of 15 years' imprisonment on a defendant who ran a company that shipped fentanyl precursor chemicals to Mexico: "Fentanyl is the number one most serious drug problem in the

---

[2] *See* https://www.acep.org/toxicology/newsroom/Oct2020/passing-the-time-after-opioid-stuffing-in-asymptomatic-adults.

[3] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal.  In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year.  Fentanyl can wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[4] Brian Mann & Aneri Pattani, In 2023 Fentanyl Overdoses Ravaged the U.S. and Fueled a New Culture War Fight, Nat'l Pub. Radio, Dec. 28, 2023. https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction (last visited January 20, 2026).

[5] *Id.*

United States, and it kills tens of thousands of Americans every year. It is poison. And those who market for profit the chemicals necessary to make this poison – when apprehended – must be severely punished." *United States v. Wang*, 23 Cr. 302 (PGG), Sentencing Tr. at 61-62 (Sept. 19, 2025). This holds true in this case, as well, and the seriousness of Lozano's conduct counsels strongly in favor of a significant sentence.

**2. The Defendant's Personal Characteristics and the Need for Deterrence**

Lozano's criminal recidivism and record of serial violence also cry out for a substantial sentence. He has repeatedly been arrested, convicted, and imprisoned for his crimes and has only escalated the seriousness of his conduct over time. A sentence of 240 months' imprisonment is appropriate to ensure that Lozano is adequately deterred. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(B).

Lozano's violent conduct is well-documented in his criminal history. At age 18, he was convicted of robbery in El Paso, Texas and received a lenient sentence of probation. (PSR ¶ 66). Within a year, his probation was revoked and he was sentenced to two years' imprisonment, but he was released early, within approximately one year, on parole. (PSR ¶ 65). The relative leniency he encountered did not serve as a corrective or deterrent: over the next few years, he burglarized multiple vehicles and was sentenced first to 80 days' imprisonment and then nine months' imprisonment. (PSR ¶ 66, 67).

In August 2016, the defendant was arrested for a horrific assault on his girlfriend. According to the police report, he chased his girlfriend and her son with a screwdriver, then choked her, punched her, stabbed her with the screwdriver, bit her, and pulled her hair, causing her to lose consciousness. (PSR ¶ 71). For this exceedingly violent and disturbing attack, he was sentenced to 160 days' imprisonment. (PSR ¶ 71). Months later, in March 2017, Lozano committed another violent assault after drinking with two other men. According to the police report, Lozano and another man forced their way into the victim's apartment and began beating the victim, before the police arrived and observed blood on the floor and walls. (PSR ¶ 72). For this crime, Lozano was sentenced to one year of imprisonment. (PSR ¶ 72). And this is not the full sum of his demonstrated violence, as Lozano has brutally assaulted women on additional occasions.

In his sentencing submission ("Def. Br."), Lozano insists that his story is "not simply one of criminal conduct" but also a story of childhood trauma and subsequent addiction. (Def. Br. 2). He further insists that his criminal history exhibits mere "dysfunction" rather than "strategic criminal planning." (Def. Br. 9). But whatever difficult circumstances Lozano may have experienced early in life, he stands before this Court having inflicted numerous traumas upon others—a pattern he has shown no sign of ceasing. And notwithstanding his characterization of his conduct as "impulsive" and chaotic, (Def. Br. 9), he has proven himself capable of scheming, with others to conduct a sophisticated and systematic smuggling scheme for which the most dangerous risks—death—were borne not by him but by those he recruited and supervised. The actions he took over the course of a year, from bribery to mule recruitment to smuggling, cannot be minimized as one-off mistakes.

Despite repeated arrests and prison terms, the defendant did not turn away from crime. To the contrary, he committed himself to even more serious conduct, culminating in the abuse of

vulnerable women in the service of facilitating the violence and deadly narcotics operations of one of the most ruthless and murderous criminal organizations in modern history—an organization that continues to terrorize the state of Sinaloa and to import its lethal drugs into the United States. Specific deterrence is thus a significant consideration in this case.

Just as important is the need for the sentence to afford general deterrence and to promote respect for the law. As described above, Lozano and those like him are responsible for facilitating the violence and lethal drug operations of the Cartel. The sentence imposed should demonstrate to the Cartel, and to drug traffickers around the world, that they are not untouchable, and that they will be called to account for their personal violence, cruelty and disregard for human life.

## V.  Conclusion

In sum, Lozano's conduct warrants a substantial term of imprisonment but the mitigating factors in her case also warrant full consideration. For the reasons set forth above, a substantial term of imprisonment of 240 months would be sufficient but not greater than necessary in this case to meet the goals of sentencing under Section 3553(a).[6]

Respectfully submitted,

JAY CLAYTON
United States Attorney


By:  /s/_____
Jane Chong
Sarah Kushner
David Robles
Assistant United States Attorneys
(212) 637-2263/-2676/-2550

cc: Leonardo M. Aldridge, Esq.
    Mark DeMarco, Esq.
    Ezra Spilke, Esq.

---

[6] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).